(129 P.3d 601)

No. 93,734

IN THE MATTER OF THE MARRIAGE OF JULIANNE RIGGS (PREVIOUSLY HEM), *Appellant,* and LARS HEM, *Appellant,* CHARLIE RIGGS, *Intervenor/Appellee.*

Opinion filed February 17, 2006.

*Christopher T. Wilson*, of Hill, Beam-Ward, Kruse, & Wilson, LLC, of Overland Park, for appellant Julianne (Hem) Riggs.

*Scott E. Wasserman* and *Trina A. Nudson*, of Lenexa, for appellant Lars Hem.

*David K. Martin,* of Payne & Jones, Chartered, of Overland Park, for appellee/intervenor Charlie Riggs.

Before GREEN, P.J., MCANANY, J., and BRAZIL, S.J.

MCANANY, J.: This appeal presents the situation of a child caught between three warring former marriage partners. The ultimate issue here is whether the district court erred in ordering stepparent visitation with B., now 8 years of age. Finding the district court's decision error free in every respect, we affirm.

Julianne (Julie) Riggs and Lars Hem, the natural parents of B., were married on January 19, 1996. B. was born on November 22, 1997. Within weeks following B.'s birth, Julie filed for divorce from Lars. She then began living with Charlie Riggs in January 1998, when B. was about 2 months old. Julie's divorce from Lars was effective the following summer on June 4, 1998.

From the outset Julie told B. that Charlie was her father, and B. called Charlie "daddy." Lars had only sporadic contact with B. for the first 6½ years of her life. At various times, Julie asked Lars about giving up his parental rights so Charlie could adopt B., but Lars never agreed to do so.

On October 26, 1998, K. was born to Julie and Charlie. K. and B. developed a close sibling relationship. Julie and Charlie were finally married on October 5, 2002. The following year, on August 27, 2003, Julie obtained a decree, with Lars' consent, to change B.'s name from Hem to Riggs, the name of her new husband.

Julie's second marriage was also short-lived. On April 1, 2004, Julie filed for divorce. It was at this time that she told B. for the first time that Charlie was not her father.

On May 11, 2004, Charlie filed a motion to intervene in the original divorce action between Julie and Lars in order to assert a claim for stepparent visitation with B. Three days later, Julie obtained a decree changing B.'s name from Riggs back to Hem.

On June 28, 2004, the district court granted Charlie's motion for temporary stepparenting time, to begin 2 days later. B., who was obviously confused and angry upon learning the person she had always known as her father was not her father, expressed the desire

not to see Charlie any further, and Charlie's last visit with her was on September 22, 2004.

Julie's divorce from Charlie was granted on September 29, 2004. Two days later Lars moved to suspend Charlie's visitation time with B. Julie filed a parallel motion. At the hearing on these motions, Dr. Christine Hillila testified to the strong, loving relationship between B. and Charlie that developed over the years. B.'s guardian ad litem, attorney Frank Gilman; her therapist, Dr. LeCluyse; and Dr. Schmidt, appointed by the court to conduct an evaluation, all agreed that it was in B.'s best interests that she have continued contact with Charlie. The district court denied the motions to terminate stepparent visitation and this appeal followed.

### Charlie as a Stepparent

Julie and Lars argue that the court erred in granting Charlie visitation since he is no longer B.'s stepparent, that relationship having ended when Julie divorced him. They reach this conclusion by examining K.S.A. 60-1616(b), which provides that "[g]randparents and stepparents may be granted visitation rights," but makes no reference to former stepparents. In further support of their position, they contend that since K.S.A. 59-2112, which relates to stepparent adoptions, refers to adoption by the spouse of a parent, when one is no longer the spouse of a parent one is no longer a stepparent. They also cite other statutes that refer to a former spouse or former parent, and reason from this that the absence of the word "former" in referring to stepparents means Charlie is not covered by the statute providing for stepparent visitation.

We exercise unlimited review in questions of law, such as the interpretation of statutes. *Cooper v. Werholtz*, 277 Kan. 250, 252, 83 P.3d 1212 (2004). In doing so, we construe statutes to avoid unreasonable results, and presume that the legislature did not intend to enact meaningless legislation. *In re M.R.*, 272 Kan. 1335, 1342, 38 P.3d 694 (2002). We examine the various provisions of an enactment in order to bring them into workable harmony if possible. *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, Syl. ¶ 2, 69 P.3d 1087 (2003).

K.S.A. 59-2112, the stepparent adoption statute which Julie and Lars rely upon, does not apply. It obviously refers to a stepparent adoption in the context of a current intact family. K.S.A. 60-1616 typically comes into play during the process, or the aftermath, of the breakup of a family. Further, K.S.A. 60-1616 contains no language that limits its application only to temporary visitation orders pending the granting of the divorce. It clearly applies to orders for visitation when or after a divorce has been granted. Its intent is obvious: to give stepparents and grandparents visitation rights under the appropriate circumstances, including while the divorce action is pending or thereafter. It does not limit the time when a motion may be brought. It specifically provides that "[t]he court may modify an order granting or denying parenting time or visitation rights whenever modification would serve the best interests of the child." K.S.A. 60-1616(c). Its purpose would be utterly frustrated if it applied only to temporary orders pending entry of the final decree of divorce.

Aside from instances of temporary orders for stepparent visitation pending a divorce, Lars and Julie suggest that the stepparent visitation statute was intended also to apply in situations such as when the parents of a child are divorced; one of the parents remarries, thereby bringing a stepparent into the equation; that parent leaves the country for an extended period, such as being deployed for military service in Iraq; and the stepparent must file a motion for visitation during the parent's absence to maintain contact with the stepchild. While this is one rather out-of-the-mainstream scenario in which the statute could be invoked, if the legislature intended its application to be so narrowly restricted, it certainly could have done so. A commonsense reading of the statute indicates otherwise.

Finally, Julie and Lars raise the familiar "floodgate" argument, citing the statistic of over 10,000 divorces in Kansas in 2002. While they cite no statistics on remarriage after a divorce, they suggest that those 10,000 Kansas divorces have the prospect of creating some lesser, but nonetheless impressive, number of stepparents. They argue that if K.S.A. 60-1616(b) includes former stepparents, "it will create a substantial policy dilemma for the state of Kansas."

We doubt it. The statute does not mandate visitation for every stepparent. It simply allows them to seek visitation which the court may or may not grant as circumstances warrant. Doubtless, not every stepparent has enjoyed the close, natural-parent-like relationship from the child's birth that Charlie enjoyed with B. A commonsense reading of the statute supports its application under circumstances such as Charlie's. Charlie is a stepparent within the contemplation of K.S.A. 60-1616(b).

### The Constitutionality of K.S.A. 60-1616(b)

Julie and Lars contend that the district court erred in finding K.S.A. 60-1616(b) was constitutional as ultimately construed. They argue that while the district court found K.S.A. 60-1616(b) was unconstitutional standing on its own, it erred when it construed the statute together with K.S.A. 38-129(a) to find it constitutional.

Julie and Lars contend that 60-1616(b), on its face, does not satisfy the due process requirements set out in *Troxel v. Granville*, 530 U.S. 57, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000). In *Troxel*, the Supreme Court examined a Washington visitation statute which allowed *any* person to petition for visitation rights at any time, and allowed state courts to grant visitation rights whenever it was in the best interests of the child, *without any regard* to the reasonable wishes of a fit custodial parent. The *Troxel* Court found the statute was an unconstitutional infringement on a custodial parent's fundamental right to make decisions concerning the care, custody, and control of her children. The statute contradicted the traditional presumption that a fit parent will act in the best interests of his or her child, and failed to accord special weight to a fit parent's decision.

Unlike the Washington statute, K.S.A. 60-1616(b) provides visitation rights only to grandparents and stepparents. However, on its face it places no limitations on the district court's discretion to grant visitation rights to grandparents or stepparents. In *Skov v. Wicker*, 272 Kan. 240, 32 P.3d 1122 (2001), our Supreme Court resolved the constitutionality of K.S.A. 60-1616(b) in the context of grandparent visitation by reading 60-1616(b) together with K.S.A. 38-129(a). K.S.A. 38-129(a) deals with grandparent visita-

tion in general terms. The court found 60-1616(b) was constitutionally infirm because it is overly broad, but that K.S.A. 38-129(a) clarifies the limits of a court's discretion in awarding visitation. When these two statutes are read together, the limitations of K.S.A. 38-129(a) are sufficient to constitutionally limit the breadth of K.S.A. 60-1616(b).

Neither K.S.A. 38-129(a) nor *Skov* deal with stepparent visitation rights. The district court applied K.S.A. 38-129(a) and the rationale of *Skov* to the stepparent provisions of K.S.A. 60-1616(b). The question for today is whether the rationale of *Skov* applies to stepparent visitation so as to maintain the constitutionality of K.S.A. 60-1616(b) in its present application.

As noted earlier, we exercise unlimited review in questions of law, such as the interpretation of statutes. *Cooper,* 277 Kan. at 252. Further, we presume that the statute is constitutional and resolve all doubts in favor of its validity. We will not strike it down unless it clearly violates the constitution. Our duty is to construe the statute in such a way that it is constitutional if we can do so without doing violence to the legislature's intent in enacting the statute. *State v. Van Hoet,* 277 Kan. 815, 829, 89 P.3d 606 (2004).

Even if a statute appears to be unconstitutional on its face, it may nevertheless be constitutional when limited and construed as in *Skov* by reading into the statute any necessary judicial requirements or constraints, provided such an interpretation is consistent with the intent of the legislature. *State v. Kleypas,* 272 Kan. 894, 1017, 40 P.3d 139 (2001), *cert denied* 537 U.S. 834 (2002); *State v. Motion Picture Entitled "The Bet,"* 219 Kan. 64, 70, 547 P.2d 760 (1976); *State v. Gunzelman,* 210 Kan. 481, 485-86, 502 P.2d 705 (1972); *State v. Hart,* 200 Kan. 153, 156-58, 434 P.2d 999 (1967).

Here, the district court found that on its face K.S.A. 60-1616(b) was unconstitutionally overbroad. However, using the rationale in *Skov,* the district court interpreted K.S.A. 60-1616(b) to be constitutional by reading the requirements of K.S.A. 38-129(a) into it, notwithstanding the absence of any reference to stepparent visitation in the latter statute. The obvious problem is that in *Skov,* the court had the benefit of an ancillary statute applying specifically

to grandparents that it could engraft onto the challenged grandparent visitation statute to render it constitutional. Here, however, the district court seems to be grafting the branch of a pear tree onto an apple tree. While this may not offend botanists, is it proper to do so here? We must satisfy ourselves that such judicial tinkering with K.S.A. 60-1616 is not an impermissible invasion into the legislative domain.

Our Supreme Court pondered these questions in *State v. Motion Picture Entitled "The Bet"* when confronted with an attack on the Kansas obscenity statute when measured against United States constitutional standards. The court observed:

"This court has on previous occasions seen fit to construe and limit criminal statutes in such a way as to uphold their constitutionality by reading judicial requirements into statutes which otherwise were overbroad.

"K.S.A. 21-2437 (relating to possession of burglary tools) was construed to require proof of intent to employ tools in the course of burglarious episodes, whenever and wherever opportunity might present itself. In *State v. Hart*, 200 Kan. 153, 434 P.2d 999, we state, 'So construed, we have no hesitancy in holding the statute to be free of constitutional infirmity. . . .' [Citation omitted.]

"K.S.A. 1971 Supp. 21-3419 (relating to terroristic threats) was construed to proscribe a communicated intent to inflict physical or other harm on any person or on property and reduce a person to an extreme fear that agitates body and mind. In *State v. Gunzelman*, 210 Kan. 481, 502 P.2d 705, 58 A.L.R.3d 522, we hold that given such limiting definitions for the words 'threat' and 'terrorize' the statute survives constitutional challenge. [Citation omitted.]

"Construction of this sort, moreover, was invited by the United States Supreme Court in *Miller* in which the Chief Justice speaking for a majority said:

'We do not hold . . . that all States . . . must now enact new obscenity statutes. Other existing state statutes as construed heretofore or hereafter, may well be adequate. [Citation omitted]' (413 U.S. 24, note 6, 37 L. Ed. 2d 430, 93 S. Ct. 2615.)" *State v. Motion Picture Entitled "The Bet,"* 219 Kan. at 70.

In *Hart*, the defendant attacked the constitutionality of the statute that makes criminal the possession of burglary tools. He claimed the statute was unconstitutionally vague because it made the mere possession of certain tools criminal without regard to intent. The Supreme Court read into the statute the requirement of intent based upon a common sense reading of the statute and analyses conducted by the high courts of other states on their own

similar statutes. In *Gunzelman*, our Supreme Court did not have any legislative pronouncement to define "terrorize," so the court relied upon common sense, the dictionary definition, and the interpretation of the word by courts in other states to define "terrorize" and overcome a claim of unconstitutional vagueness.

It is clear that limiting language that the courts engraft on an otherwise constitutionally infirm statute can arise from many sources and is not limited to language in other statutes, such as the other statute referred to in *Skov*. If a court can look to sources beyond our statute books for guidance, it surely is proper for it to seek guidance from a statute that expresses legislatively imposed limitations on the power of the courts to grant visitation to persons other than natural parents.

Although *Skov* did not consider stepparent visitation, its reasoning is not inimical to Charlie's visitation claim. K.S.A. 60-1616(b) treats grandparents and stepparents in an identical fashion. Each may move the court for visitation, and each may or may not be granted visitation, depending upon the facts. What *Skov* engrafted onto K.S.A. 60-1616(b) are the requirements from K.S.A. 38-129 that (1) the visitation is in the child's best interests, and (2) there exists a substantial relationship between the child and the grandparent. While Julie and Lars complain that K.S.A. 38-129 does not refer to stepparents, they do not argue that the two requirements of the statute are somehow inadequate for evaluating visitation claims by stepparents. What additional standards should be imposed on a stepparent before the court could grant visitation? If a court can grant visitation to a grandparent who has a substantial relationship with the child and it is in the child's best interests that visitation be ordered, why would that not also be enough for visitation with a stepparent? Julie and Lars do not suggest a more stringent standard. We conclude that no reasonable basis has been established upon which we should distinguish the standards for examining a stepparent's claim for visitation from a grandparent's claim.

A court is not permitted to strike down a legislative enactment merely to substitute its own belief of what the law ought to be for that of the legislature. Likewise, we must resist similar efforts by

litigants who seek to bend the law to their own ends when the constitutionally of an enactment can be saved by construing it in a manner that is both constitutional and consistent with legislative intent. That is what we face today: a statute that is constitutional when construed in a manner consistent with the legislature's intent.

The district court did not err in its analysis. K.S.A. 60-1616(b) is constitutional with regard to stepparent visitation when the requirements and limitations enumerated in *Troxel, Skov,* and K.S.A. 38-129(a) are engrafted onto it.

### The Order for Visitation

Finally, Julie and Lars argue that even if K.S.A. 60-1616(b) is constitutional, the district court erred in ordering stepparent visitation. They argue the district court could only issue an order overriding their wishes if they proposed an unreasonable visitation plan. They argue the district court did not find their proposed plan unreasonable, and thus the court could not grant visitation over their objections.

This argument fails both factually and conceptually. Their visitation plan for Charlie was that he should have none. At the hearing on their motions to discontinue Charlie's visitation, Julie and Lars argued that the visitation was causing B. emotional trauma and that stepparent visitation was unconstitutional.

While it is true, as Julie and Lars claim, that the district court believed Lars and Julie were generally acting in B.'s best interests, they failed to note the court's finding that in seeking to bar all visitation between B. and Charlie, the only father B. had known for the first 6 of her then 7 years of life, they were not acting in B.'s best interests.

In *In re T.A.,* 30 Kan. App. 2d 30, 38 P.3d 140 (2001), which dealt with grandparent visitation, the court noted that because this type of visitation interferes with a parent's constitutional right to rear his or her children, the district court must give material weight and deference to the position of a fit parent. It held that "[t]he trial court should presume that a fit parent is acting in the best interests of the child and not substitute its judgment for the parent's, absent a finding of unreasonableness." 30 Kan. App. 2d at

35. "Absent a finding of unreasonableness, the trial court should adopt a grandparent visitation plan proposed by the parent." 30 Kan. App. 2d 30, Syl. ¶ 4.

The only proposal to the district court from Julie and Lars was that they, as parents, abdicate any guidance over their daughter on this issue and simply defer to the wishes of a 7-year-old child as to whether she wants to see Charlie. This was tantamount to no plan at all. The district court exercised proper deference to the position of Julie and Lars, but found that in this instance their proposal for visitation was unreasonable.

Once the parental preference presumption was rebutted with substantial evidence, the court considered the history and nature of the relationship between B. and Charlie over the years and the substantial expert testimony and recommendation of B.'s guardian ad litem that visitation with Charlie would be in B.'s best interests. In doing so the district court satisfied the factors enumerated in K.S.A. 38-129(a) and *Skov*. Accordingly, the district court did not err in granting stepparent visitation to Charlie.

Affirmed.