NOT DESIGNATED FOR PUBLICATION

No. 113,411

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE MATTER OF THE MARRIAGE OF
C.E.P.,
*Appellant*,

and

M.D.P.,
*Appellee*.

D.P.S.,
*Intervenor/Appellee.*


MEMORANDUM OPINION

Appeal from Shawnee District Court; C. WILLIAM OSSMANN, judge. Opinion filed March 4, 2016. Vacated and remanded with directions.

*Jonathan M. Snyder*, of Cook & Associates, L.L.C., of Topeka, for appellant.

*Allison H. Maxwell* and *James R. McEntire*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, L.L.C., of Topeka, for appellee M.D.P. and intervenor/appellee D.P.S.


Before PIERRON, P.J., BRUNS and GARDNER, JJ.


*Per Curiam*: This appeals arises from a dispute between C.E.P., the mother (Mother) of K.P. (Minor Child), and D.P.S., K.P.'s paternal grandmother (Grandmother), over grandparent visitation. Specifically, Mother contends that the district court erred in awarding visitation to Grandmother by not giving her proposed visitation schedule any special weight. Mother also contends that the district court was statutorily required to

1

assess costs and reasonable attorney fees against Grandmother unless it found that justice and equity required otherwise. For the reasons set forth in this opinion, we vacate the district court's journal entry entered on February 3, 2015, and remand the issue of grandparent visitation—including the question of costs and attorney fees—to the district court.

FACTS

In May 2009, Mother gave birth to the Minor Child, and 4 or 5 months later, the father, M.D.P. (Father), became involved in the Minor Child's life. Mother and Father eventually married in 2010. At the time of their marriage, Father was stationed in the state of Washington as an active member of the United States Navy, and Mother was a college student in Topeka.

After the wedding, Mother and the Minor Child remained in Topeka, where Mother attended school and worked as a waitress in the evenings. Both the maternal and paternal grandparents watched the Minor Child while Mother worked and attended school.

In May 2010, Father was deployed to Afghanistan, and upon his return in December 2010, Mother moved with the Minor Child to Washington to live with him. Sometime in the fall of 2011, Father learned that he would be deployed again. Because Father was going to be deployed and Mother was having difficulties transferring her college credits to a college in Washington, Mother returned to Kansas with the Minor Child in approximately December 2011 to finish her education.

From January to March 2012, Mother and the Minor Child lived with Grandmother and her husband. During this time, Grandmother and her husband—who is the Minor Child's step grandfather—watched the Minor Child anywhere from 3 to 5

2

nights per week while Mother worked. Even after Mother moved out, Grandmother continued to frequently watch the child, which involved some overnight visits.

In December 2012, Mother and the Minor Child once again traveled to Washington when Father returned from his deployment. After about 2 weeks, Mother returned to Kansas while the Minor Child remained with Father. When Mother left Washington, she and Father agreed that the Minor Child would remain with him for 3 weeks. At the end of 3 weeks, however, Father refused to allow the Minor Child to return to Kansas.

On March 5, 2013, Mother filed a petition for divorce in Shawnee County District Court. Shortly thereafter, the district court ordered Father to return the Minor Child to Kansas. Moreover, the district court ordered: "During the pendency of this matter, the parties' minor child shall remain in the care, custody, and control of [Mother] with [Father] to have reasonable parenting time." The district court also entered an agreed order for conciliation to help Mother and Father agree on legal custody, residency, parenting time, and child support. Three days after the Minor Child returned to Kansas, Father filed a motion for grandparent visitation in the divorce proceeding. In his motion, Father alleged that Mother was denying unsupervised contact between the Minor Child and Grandmother.

On April 11, 2013, Mother filed a motion to strike Father's motion, alleging that he did not have standing to request grandparent visitation. Eleven days later, however, Grandmother and her husband filed a motion for intervention to assert grandparent visitation rights. Grandmother alleged that "the child would benefit from a continuation of the grandparent contact." In response, Mother argued that an order compelling grandparent visitation was not in the Minor Child's best interests.

3

A judge pro tem conducted an initial hearing on the motion for intervention to assert grandparent visitation on May 9, 2013. During the hearing, Mother argued that although the Grandmother had a statutory right to seek visitation, her husband did not have standing to do so. Mother also argued that the district court should not order conciliation on the issue of grandparent visitation prior to an evidentiary hearing. Although the judge pro tem ordered conciliation, she did not address Mother's objection to whether Grandmother's husband had standing to pursue grandparent visitation.

On August 21, 2013, the district court judge granted only the Grandmother's motion to intervene. On October 24, 2013, the district court entered a decree of divorce and granted the Mother and Father's agreed parenting plan. In the parenting plan, Mother and Father agreed to joint legal custody of the Minor Child, with residency to Mother and parenting time to Father. Specifically, Father was to have time with the Minor Child in June and July each summer; approximately 10 days in the spring; approximately 10 days during Christmas; up to 30 days when Father exercised military leave in Topeka; and other holidays based on the Shawnee County Family Law Guidelines.

The parties briefed the issue of grandparent visitation and, prior to the hearing, a conciliator issued a report to the district court recommending visitation with Grandmother every other Tuesday from 3:30 p.m. through the night until he is returned to preschool the following morning and every other Saturday at noon through the next day at 4:00 p.m. The conciliator also recommended that Grandmother have visitation with the Minor Child on any holiday set aside for Father if he was unable to exercise his parenting time. In Mother's memorandum in opposition to the motion for grandparent visitation, she agreed that a substantial relationship existed between the Minor Child and Grandmother but proposed that Grandmother have visitation on the first Saturday of the month from 3:00 p.m. through Sunday at 3:00 p.m.; the third Wednesday of the month following preschool or school through 8:00 p.m.; during school and extracurricular activities; and at other times as agreed upon by the parties.

4

On April 2, 2014, the district court held an evidentiary hearing, during which seven individuals testified, including the conciliator, Grandmother, and Mother. At the time of the hearing, the Minor Child was almost 5 years old. Initially, the conciliator testified that she performed only one conciliation between the Mother and Grandmother and her husband for the purpose of grandparent visitation. She stated that Mother did not show for the second joint session, claiming that she was sick. The conciliator testified that she never rescheduled the second meeting because she did not think the parties were going to agree on visitation. When asked to explain the basis for her recommended schedule she stated,

"I think, in my mind, there is no doubt that this little guy has a very close bond with his grandparents, and with his grandmother, and also with his step-grandfather. And I think because of his age, his young age, I think that he really needs that consistency and that continuity of having time with his father' family because his dad is gone. And I think if both parents were in the same town, and having worked with both of them, I would've recommended that [Father] . . . have—I probably would've recommended an equal time parenting plan. I mean, I think that both of these parents have a very close bond with this child. And I think it is just important for that bond to be preserved with his side of the family, with [Father's] side of the family, too. And so it seemed to me that this would be a way for—to preserve that relationship, and in [K.P.'s] best interest, I think."

The conciliator stated that at the beginning of conciliation the Grandmother requested frequent overnight visitation and Mother offered one overnight stay per month. On cross-examination, the conciliator stated that she did not list Mother's proposal in the recommendation she submitted to the district court because Mother was "really reticent" about offering any more visitation than what Grandmother was receiving at the time of conciliation—"Saturdays from 4 until 9, and then Sundays from 11 until 4" as well as one monthly overnight stay.

The conciliator also testified that she did not give any deference to the Mother when making her recommendation but focused on what she believed was in the best interests of the child. When asked by the district court why she recommended an overnight stay every week, the conciliator explained "because the father is gone, and I think that . . . if, you know, dad was here, he would be having, at a minimum, every other weekend, and I think that it's–the dad's been very involved with [K.P.] and [Mother]."

Next, Grandmother testified that after Mother obtained full-time employment in May 2013, she initially allowed them to see the Minor Child on Saturday evenings from 4 p.m. to 9 p.m. and either Tuesday or Wednesday evenings from 4 p.m. to 8 p.m. Moreover, Grandmother testified that she asked Mother for more time with the Minor Child because she was used to having him more often. According to Grandmother, Mother told her she wanted her side of the family to watch the Minor Child as well. A few months before the evidentiary hearing, however, Mother evidently told Grandmother that instead of watching the Minor Child during the week, they could watch him all day on Monday because she did not have daycare for the Minor Child that day. Grandmother testified that she was not happy with this arrangement because she worked full time on Mondays, and was, therefore, only able to see the Minor Child on Saturday nights.

Mother testified that when she graduated from college in May 2013, she obtained a full-time job that did not require her to work during the evenings. Mother further testified that throughout the proceedings she believed it was important for the Minor Child to maintain contact with both sides of the family, so she allowed Grandmother to have what she considered to be a substantial amount of visitation in several ways, including inviting Grandmother and her husband to sporting events, allowing them to visit the Minor Child at daycare, and inviting them to social events.

When Mother was asked about any issues she had with the schedule proposed by the conciliator and Grandmother, she stated,

6

"My issue with that is several things. [Minor Child] has a very busy schedule as we've talked about with sports, which really limits my ability to be able to spend one-on-one time with him, as well as my work schedule. You know, he's not a little one anymore, and that 8 to 5 schedule really hampers my time with him down to three to four hours during the week. Also during this time, I am making sure that [Father] has quality time with his son, which also takes away from my one-on-one time with [Minor Child]. So there's so many busy schedules that are fit into one that I feel like that would hamper our schedule, as well as we've talked this whole time about consistency and what would be best for [Minor Child]. With that schedule, with him starting kindergarten, I don't think that that would—I think that would be confusing to him and would hamper him if one day a week he's waking up and getting ready for school, and getting on the school bus, and going to school, and coming home to that house, and then another day he's doing something different."

Mother also testified that the schedule she proposed would be the "bare minimum" and that she intended to invite them to sporting events as well as contact them to see if they wanted to watch Minor Child when she had to work late. Mother asserted that her proposed schedule provided sufficient time to allow the Grandparents to maintain a substantial relationship with the Minor Child.

More than 10 months later—on February 3, 2015—the district court entered an order on grandparent visitation. The reason for this delay is unclear from the record on appeal. Regardless, the district court entered an order granting visitation to Grandmother and adopting the visitation schedule recommended by the conciliator. In the order, the district court noted that Grandmother's husband had no legal rights under the grandparent visitation statute. In addition, the district court made the following findings:

"9. [Grandmother and her husband] have a substantial relationship with the child and have provided substantial support to . . . the child.

7

"10. That the child has enjoyed and benefitted from the regular contact with [Grandmother and her husband].

"11. That the child would benefit from a continuation of contact with his paternal grandmother.

. . . .

"16. Visitation with [Grandmother] would be in the child's best interest and a substantial relationship between the child and the grandmother has been established."

"17. Delegated parenting time would be in the child's best interests.

"18. The minor child is involved in various sports and other activities after school and on weekends.

"19. Considering the facts of this case, the recommendations made by the Court appointed neutral conciliator, the substantial relationship between [Grandmother] and the child, and the inability of the Respondent to exercise normal visitation due to his military commitment, the Petitioner's limited proposed visitation is not reasonable and should not be and is not adopted by this court.

"20. Considering the best interests of the minor child, facts of this case, the recommendations made by the Court appointed neutral conciliator, the past relationship between [Grandmother] and the child, and the inability of the Respondent to exercise normal visitation due to his military commitment, [Grandmother] should be and hereby is awarded grandparent visitation as follows . . . ."

ANALYSIS

*Special Weight Given to Parental Determinations*

On appeal, Mother first contends that the district court failed to consider the presumption that a fit parent will act in his or her child's best interests. To that end, Mother correctly points out that neither the transcript from the evidentiary hearing on the grandparent visitation motion nor the order granting visitation mention this presumption. Moreover, Mother points out that it is impossible to determine the weight, if any, given to her proposed grandparent visitation plan. In response, Grandmother contends that it may be inferred from the record that the district court did apply the presumption that a fit parent will act in the best interest of the child.

It is important to note that Mother agrees that Grandmother and the Minor Child have a substantial relationship. In addition, Mother agrees that some amount of grandparent visitation is in her son's best interests. In fact, the record indicates that Mother facilitated contact between the Minor Child and Grandmother—albeit not at the rate Grandmother would prefer. Thus, the primary issue on appeal is whether the district court gave at least some "special weight" to Mother's determination or decision regarding the Grandmother's visitation time.

As the parties recognize, the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The United States Supreme Court has explained that the Fourteenth Amendment provides certain fundamental rights and liberty interests. *Washington v. Glucksberg*, 521 U.S. 702, 719-20, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). In particular, the United States Supreme Court has recognized that "perhaps the oldest of the fundamental liberty interests" is a fit parent's right to the care, custody, and

control of his or her children. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

At common law, grandparents had no legal right to override a parent's wish to deny contact with a child. *In re Hood*, 252 Kan. 689, 691-94, 847 P.2d 1300 (1993); Elrod, Child Custody Practice & Procedure § 7:6 (2015). From the 1960s to 2000, states enacted statutory visitation rights for grandparents if it was in the child's best interests. 2 Elrod, Kansas Law and Practice, Kansas Family Law § 13:10 (2015-2016 ed.). The Kansas grandparent visitation statute has been amended several times since it was first enacted in 1971. See L. 1971, ch. 149, sec. 1; *In re T.N.Y.*, 51 Kan. App. 2d 956, 960-62, 360 P.3d 433 (2015) (outlining the history of Kansas' grandparent visitation statute and finding that limitation on grandparent visitation to only divorce proceedings violates the equal protection rights of children whose parents never married).

The grandparent visitation statute currently provides:

"(a) In an action under article 27 of chapter 23 of the Kansas Statutes Annotated, and amendments thereto, grandparents and stepparents may be granted visitation rights.

"(b) The district court may grant the grandparents of an unmarried minor child reasonable visitation rights to the child during the child's minority upon a finding that the visitation rights would be in the child's best interests and when a substantial relationship between the child and the grandparent has been established.

"(c) The district court may grant the parents of a deceased person visitation rights, or may enforce visitation rights previously granted, pursuant to this section, even if the surviving parent has remarried and the surviving parent's spouse has adopted the child. Visitation rights may be granted pursuant to this subsection without regard to whether the adoption of the child occurred before or after the effective date of this act." K.S.A. 2015 Supp. 23-3301.

10

In *Troxel*, the United States Supreme Court reaffirmed the fundamental right of parents to raise their children free of state interference. In doing so, the Supreme Court acknowledged that although the "nationwide enactment of nonparental visitation statutes" was likely due to changing family demographics, it emphasized that parents still retained their fundamental right to make decisions regarding the care, custody, and control of their children. 530 U.S. at 64-65. In finding the State of Washington's grandparent visitation statute unconstitutional, the Supreme Court concluded that it is improper to disregard decisions made by a fit parent concerning visitation based solely on a determination of the child's best interests. 530 U.S. at 67.

In reaching this conclusion, the Supreme Court explained that

"'our constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations. . . . The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.'" 530 U.S. at 68 (quoting *Parham v. J. R*., 442 U.S. 584, 602, 99 S. Ct. 2493, 61 L. Ed. 2d 101 [1979]).

Accordingly, the United States Supreme Court held that when a "fit parent's decision [regarding grandparent visitation] becomes subject to judicial review, the court must accord *at least some special weight* to the parent's own determination." (Emphasis added.) 530 U.S. at 70. The Supreme Court was further troubled that the district court gave no weight to the fact that the mother had agreed to some amount of visitation even before the grandparents initiated proceedings. 530 U.S. at 71-72. Thus, the Supreme Court ultimately summarized that "this case involves nothing more than a simple disagreement between the [district court] and [the mother] concerning her children's best interests" and found that the district court's decision violated the mother's fundamental

11

right to make decisions concerning the care, custody, and control of her children. 530 U.S. at 72.

Less than one year after *Troxel*, the Kansas Supreme Court considered a constitutional challenge to Kansas' grandparent visitation statute. *Kansas Dept. of SRS v. Paillet*, 270 Kan. 646, 16 P.3d 962 (2001). In *Paillet*, the father died in a car accident shortly after his child was born, and the paternal grandparents petitioned for visitation. The district court granted visitation, finding that it was in the child's best interests and that a substantial relationship had been established between the child and the grandparents. 270 Kan. at 647-48. Although the Court of Appeals found that there was insufficient evidence of a substantial relationship, it nonetheless affirmed, concluding that the mother had unclean hands because she continually and unreasonably denied visitation with the child. 270 Kan. at 649-50.

While the case was pending on appeal, the United States Supreme Court released its decision in *Troxel*, and our Supreme Court permitted the mother to raise a due process argument similar to the one raised in *Troxel*. Initially, the Kansas Supreme Court agreed with the Court of Appeals that there was no evidence of a substantial relationship but disagreed that it could—in effect—create an exception through equitable principles for which the statute did not provide. 270 Kan. at 654. In regard to mother's constitutional claims, the Kansas Supreme Court summarized *Troxel* as follows:

> "The [United States] Supreme Court identified a combination of factors that demonstrated the unconstitutionality of the trial court's application of the statute. First, by presuming the grandparents' request should be granted in the absence of proof that it would not be in the children's best interest, it 'directly contravened the traditional presumption that a fit parent will act in the best interest of his or her child.' [Citation omitted.] The Supreme Court observed that a fit parent's decision must be accorded 'at least some special weight.' [Citation omitted.] Second, the trial court failed to give any weight to [the mother's] not opposing visitation. [Citation omitted.] The Supreme Court

12

believed it significant that 'many other States expressly provide by statute that courts may not award visitation unless a parent has denied (or unreasonably denied) visitation to the concerned third party. [Citations omitted.]' Third, the reasons given by the trial court for awarding visitation to the [grandparents] were insubstantial." 270 Kan. at 655-56.

Although our Supreme Court upheld the then-existing grandparent visitation statute on its face—noting that the statute was not nearly as broad as the statute addressed in *Troxel*—it found that the application of the statute to the facts of the case violated the mother's due process rights. 270 Kan. at 657-60. More specifically, it found that "[t]he trial court made no presumption, as required by *Troxel*, that a fit parent will act in the best interests of his or her child." 270 Kan. at 658.

Since *Troxel* and *Paillet*, our Supreme Court—as well as several panels of this court—have reiterated that a district court must presume that a fit parent is acting in the child's best interests and must give *special weight* to the parent's proposed visitation schedule. See *Skov v. Wicker*, 272 Kan. 240, 248, 32 P.3d 1122 (2001); *In re Creach*, 37 Kan. App. 2d 613, 620, 155 P.3d 719 (2007); *State ex rel. Secretary of Dept. of S.R.S. v. Davison*, 31 Kan. App. 2d 192, Syl. ¶ 3, 64 P.3d 434 (2002); *DeGraeve v. Holm*, 30 Kan. App. 2d 865, 868, 50 P.3d 509 (2002). Moreover, panels of this court have also held that third-party visitation statutes must be strictly construed because they are a creature of statute and in derogation of parents' constitutional right to direct the upbringing of their children. *In re T.A.*, 30 Kan. App. 2d 30, 34-35, 38 P.3d 140 (2001); *Davison*, 31 Kan. App. 2d 192, Syl. ¶ 3. This does not mean, however, that the presumption automatically compels a district court to adopt a fit parent's proposed visitation schedule; "otherwise the parent could arbitrarily deny grandparent visitation without the grandparents having any recourse." *In re T.A.*, 30 Kan. App. 2d at 34.

Although unpublished opinions are not binding precedent, they may be cited if the opinion has persuasive value with respect to a material issue not addressed in a published

13

opinion and would assist the court in disposition of the issue. Kansas Supreme Court Rule 7.04(g)(2) (2015 Kan. Ct. R. Annot. 64). Here, Mother cites a case that is very similar to the current one. In *In re Marriage of Thomas*, No. 90,807, 2004 WL 48890 (Kan. App. 2004) (unpublished opinion), a mother needed help from the father's parents to watch her child so she could attend school during the day and waitress in the evenings. The father was an active member of the military and was stationed in California. After the mother and father divorced, the paternal grandparents petitioned for visitation because they were unhappy with mother's visitation schedule. The mother did not dispute that there was a substantial relationship between the child and the grandparents, but she wished to permit less visitation because she was no longer in school, she no longer needed to work two jobs, and the child was older. 2004 WL 48890 at *1.

In *Thomas*, the district court adopted the grandparents' proposed visitation schedule, which required the child to spend every other weekend from Friday evening until noon on Sunday with them. A panel of this court reversed, reasoning that

> "[b]y adopting the grandparents' plan over hers, the court violated her fundamental right to the custody, care, and control of her son. [Citation omitted.] Moreover, there was nothing in the district court's findings or the record on review to overcome the fundamental presumption that a fit parent will act in the best interests of his or her child." 2004 WL 48890, at *2.

Returning to the present case, it is impossible for us to tell whether the district court gave at least some special weight to Mother's proposed grandparent visitation schedule. In fact, based on comments made by the district judge at the conclusion of the evidentiary hearing, one could conclude that the district judge evaluated the conflicting proposed schedules on equal grounds. Specifically, the district judge stated, "As I indicated, the issue here is trying to determine what parenting time schedule we are going to adopt, maybe mom's and maybe [the conciliator's] that's been adopted by [Grandmother], or maybe something in between." However, one could argue that when

14

the district court found Mother's proposed grandparent visitation schedule unreasonable, it was attempting to consider the presumption and apply the special weight requirement. Regardless, we cannot discern from the record on appeal whether the district court considered the presumption or special weight requirement. In addition, it is impossible to determine from the record on appeal what weight—if any—the district court considered the fact that Mother had facilitated visitation with Grandmother even before the motion to intervene was filed. See *Troxel*, 530 U.S. at 71; *Paillet*, 270 Kan. at 656.

Under these circumstances, we conclude that it is appropriate to vacate the order of grandparent visitation entered on February 3, 2015, and to remand this matter to the district court with instructions to apply the *Troxel* presumption and to give at least some special weight to Mother's determination of what is in her son's best interest. See *In re Creach*, 37 Kan. App. 2d at 621; *Davison*, 31 Kan. App. 2d at 201. In so ruling, we do not take a position regarding the ultimate amount of visitation Grandmother should receive. Rather, we leave these issues to the district court's discretion upon application of the appropriate legal principles. See *In re Marriage of Kimbrell,* 34 Kan. App. 2d 413, 419, 119 P.3d 684 (2005). Finally, in light of this decision, we find that it is unnecessary to reach the other arguments presented by the parties with the exception of the issue of attorney fees.

*Attorney Fees*

Mother also contends that the district court erred by not awarding her costs and reasonable attorney fees. When a party seeks grandparent visitation under K.S.A. 2015 Supp. 23-3301 *et seq.*, "[c]osts and reasonable attorney fees shall be awarded to the respondent . . . unless the court determines that justice and equity otherwise require." K.S.A. 2015 Supp. 23-3304. In other words, as a panel of this court has recognized, "'[t]he legislature clearly intended that [grandparents] pay the costs and the attorney fees unless the trial court specifically finds that justice and equity require otherwise.'" *In re*

15

*T.N.Y.*, 51 Kan. App. 2d at 969 (quoting *In re Cathey*, 38 Kan. App. 2d 368, 377, 165 P.3d 310 [2007] [Green, J., concurring]).

Here, the record reveals that Mother never requested attorney fees after Grandmother intervened in this matter. We note, however, that when responding to Father's motion for grandparent visitation, Mother requested attorney fees in her prayer for relief. Notwithstanding, Grandmother maintains that Mother may not raise the issue for the first time on appeal.

A review of the record reveals that the district court was clearly aware of the statute mandating attorney fees because its order quotes K.S.A. [2012 Supp.] 23-3304 in its entirety under the section titled, "Relevant Statutes." But the order lacks any findings or conclusions of law regarding this issue. Accordingly, we find that it is appropriate to remand this issue to the district court for determination based on the evidence presented by the parties. See *Spradling v. Harris*, 13 Kan. App. 2d 595, 602-03, 778 P.2d 365 (1989). Finally, we note that Mother submitted a request for appellate attorney fees after oral argument and we will rule on this request in a separate order.

We, therefore, conclude that the grandparent visitation order should be vacated and that this matter be remanded to the district court for further consideration along with the issue of attorney fees and costs.

Vacated and remanded with instructions.